## FRANK WILSON ET AL. v. JOSEPH B. WILSON.

MENTAL INCAPACITY NOT SHOWN BY RECITAL OF CIRCUMSTANCES INDICATING PHYSICAL WEAKNESS, FAILURE OF MEMORY, SLIGHT MISTAKES IN BUSINESS AFFAIRS, NOR BY FAILURE TO MAKE KIND OF WILL WITNESSES WOULD HAVE MADE.

> Want of mental capacity on the part of the testator is not shown by a recital of circumstances and incidents which go no further than to indicate some physical weakness, or failure of memory, or mistake of an unimportant character in connection with his business affairs; nor can an attack on a will be successfully maintained where the witnesses for the contestants seem to have reached the belief that the testator was incompetent to make a will because he did not make the kind of a will which they would have made or which they thought he ought to have made.

[Syllabus by the court.]

ERROR to common pleas court.

*A. A. Stasel* and *Flory & Flory*, for plaintiffs in error.

*Kibler & Montgomery*, for defendant in error:

Wilson v. Wilson.

Cited and commented upon by the following authorities: Thompson, Trial Ev. Sec. 1121; *Windisch* v. *Opp,* 9 Circ. Dec. 516 (17 R. 465); 2 Enc. Evidence p. 841; *Hayes* v. *Candee,* 75 Conn. 131 [52 Atl. Rep. 826]; Page, Wills Sec. 125; *Smith* v. *Henline,* 174 Ill. 184 [51 N. E. Rep. 227]; *Hall* v. *Hall,* 78 Ohio St. 415.

**VOORHEES, J.**

The will of James P. Wilson, the validity of which is the question in controversy in this action, and under review in these proceedings in error, was made on January 5, 1900, at his office, or place of business, at the village of Granville, in the county of Licking, Ohio. The testator died June 7, 1906, being then of the age of about seventy-six years. At the time the will was executed, he was about seventy years old. He died leaving Susan Wilson, his widow, and three children, two sons and a daughter, namely: Joseph B. Wilson, Frank Wilson and Mary Wilson.

The said Joseph B. Wilson contests the will on two grounds, namely:

First. That by reason of age, disease and other causes, said James P. Wilson was incompetent mentally to do or understand ordinary business transactions, or to understand or appreciate what he was doing when he signed said will; that he was then of unsound mind and memory; that he had not sufficient mental capacity to know or understand the extent of his estate and the persons who would naturally be the objects of his bounty.

Second. That said will was procured to be made and executed by the defendant, Frank Wilson, by persuasion and undue influence exercised by him at and before the time of the making of said will, over and upon the mind and will of said James P. Wilson, by which said James P. Wilson, against his will, was wrongfully induced to favor said Frank Wilson and his children, namely: James Perry Wilson and Eva Wilson, (who are made defendants in said action) in the disposition of testator's property; that testator's mind, without any just cause or reason, became set against said contestant, Joseph

B. Wilson, causing testator to discriminate against him in making said will.

After the death of said James P. Wilson, said will was admitted to probate and record by the probate court of said Licking county.

The testator by the will in question gives all his property, real and personal, wherever located, to his wife, Susan Wilson, during her natural life. At the death of his wife, he devises and bequeaths to his son, Joseph B. Wilson, the farm on which he, Joseph, then lived, containing 111 acres, more or less. If the said Joseph should die without issue of his body, then at his death said farm of 111 acres to go back to his testator's legal heirs.

To his daughter, Mary Wilson, he gives his farm situated in Crawford county, Ohio, containing 77 acres, more or less; also the old Water Cure house and lot 120 and lot 128 situated in the village of Granville, Licking county, Ohio; also all his household goods. To his son, Frank Wilson, he gives what he designates his home place of 15 acres, lying just south of Raccoon Creek in Granville township, Licking county, Ohio; also the three lots in the village of Granville, with the appurtenances thereto belonging; also to his son, Frank, the Eggleston farm, containing 126 acres, more or less, said farm lying along the Alexander road in said county.

To his grandson, James Perry Wilson, he gives $1,000; and to his granddaughter, Eva Wilson, he gives the property known as the Aken property, situated in the village of Granville. If any property should be left after paying the demises provided for, the balance to be divided equally between his said daughter, Mary, and his son, Frank.

He named his daughter Mary and his son Frank executors, without bond.

The testator had made a prior will in the year 1898 or 1899, written by J. C. Maylone (who was a witness for the contestant in this trial), and through or by the disclosure by this witness of the contents of said will written by him to some of the family, among them to the contestant Joseph, the old gentleman afterwards, and in about a year or less from the

making of said will, made the will in question, securing the services of a different scrivener to write the second or last will. Just what the provisions of the first will were, or wherein it differed, if at all, from the last will, is not disclosed by the record in this case.

The testator at the time the will in question was made, owned an estate, real and personal, estimated in amount in the neighborhood of $50,000. He had been a thrifty man in the accumulation of property. He was an uneducated man; in the language of some of the witnesses "a self-made man," and a shrewd dealer in business matters. He was able to make money at times when others were feeling the effects of general depression and dullness in business affairs. He continued to carry on his business (that of a lumber dealer), some four or five years after the making of the will in question, being assisted at times in some of the office work, in the way of keeping his accounts, by his daughter, Mary, and his son, Frank, was in some way connected with the lumber business with his father, but as a general thing the business was managed by the old gentleman himself.

The facts bearing upon the want of testamentary capacity offered in behalf of the contestant, namely: Richards, Partridge, Jones, Agey, Maylone, Jos. B. Wilson and Scott Ramey, there is an inherent weakness in their testimony, in the facts and circumstances related and detailed by them, upon which their opinion is based, as to the want of mental capacity of the testator to transact ordinary business. Without undertaking to give in detail the facts, incidents and circumstances related by these several witnesses upon which their opinions are based, it will be sufficient to state that the circumstances and incidents tend to show some physical weakness, failure of memory, and slight mistakes made by the testator in connection with his business affairs, but when tested by reason and the experience of mankind, these circumstances and incidents are such that may occur with persons where there would be no question of their ability to transact ordinary business. Take, for example, the incident where the old gentleman on one occasion had lost his pocketbook, and spent some hours in hunting for

it. It was lost in the office. Just how it was lost or what he was doing with his pocketbook when it was misplaced is not disclosed, but it seems that this incident is greatly magnified by the witnesses in giving an account of it.

Take the incident mentioned by Mr. Jones, where he had settled a business matter with the old gentleman, whereby a note was given by Mr. Jones to Mr. Wilson. After the note was executed, the old gentleman requested Mr. Jones to keep it in his, Jones', safe. It seems that the old gentleman had no safe at his place of business at the lumber yard. If this circumstance or incident has any significance at all, it is simply this, showing the great confidence that Mr. Wilson had in Mr. Jones, a man with whom he had had numerous dealings. He seems to have had more confidence in the honesty of Mr. Jones than Mr. Jones had himself, because Mr. Jones gives this as an incident or circumstance, in his judgment, showing want of business capacity in Mr. Wilson.

Looking to the testimony of Mr. Richards, the scrivener who wrote the will, he gives as his reasons why, in his judgment, the old gentleman was incompetent to do business, that when he (Richards) called at the office at the lumber yard on the morning, to write the will, that he was there some fifteen minutes and nothing was said by the old gentleman as to the business that he wished Richards to transact.

Finally, Richards said to the old gentleman that "Frank (meaning the son of the testator) came to my house and requested me to come down and write your (Mr. Wilson's) will;" the old gentleman said: "I suppose I will have to"; the witness says to him: "You don't have to do anything of the kind"; the old gentleman then said: "Well, write it"; and witness sat down and wrote Mr. Wilson's will. The witness testifies that the items and terms of the will were given and dictated to him by the old gentleman; that they were at the office alone, Frank, the son, coming into the office once or twice while the will was being prepared. He said nothing the first time he came in, but the second time he mentioned the Eggleston farm, but what he said about the Eggleston farm witness does not remember. After the will was finished and

Wilson v. Wilson.

the witness and Frank were going out of the office up street, Frank said that "Joe's wife ought not to have that property after his death," that is, the property on which Joseph resided. The testimony of this witness seems to be very indefinite in many of the details as to the transactions that occurred at the time the will was written; and in the cross-examination his capricious answers to many of the questions tend largely to weaken his testimony.

When you examine the testimony of the witnesses for the contestant, who have given opinions as to the mental capacity of Mr. Wilson to transact business, it seems to be influenced very largely by their notions as to what kind of a will Mr. Wilson should have made. In other words, because he did not make such a will as they would have made or thought he should make, they were led to believe that he was mentally incompetent to transact business. Taking the will itself, its terms and conditions, dictated, as the scrivener says it was, by Mr. Wilson himself without suggestions from him or anyone, or the items given, there is nothing inherent in the will or language used that tends in any way to show a want of comprehension of the business in which he was engaged, the extent of his property, or the objects of his bounty. The only thing that these witnesses are inclined to complain about was, that the devise to Joseph was not what they would have made or thought it should be. The theory of the law is that a testator who is competent and free from restraint, has a right to dispose of his estate in any way he may deem best. He is not required to make an equitable will, and he may, if he chooses, exclude his children, or divide the estate among them unequally. The question in all such cases is: Was the will the free act of a competent testator? Looking to the testimony and evidence offered by the propounders of the will, and the experience that these witnesses had with Mr. Wilson in a business way, and the numerous transactions had with him, covering a long period of time, not only before the making of the will in question, but for some years after its execution, shows that the opinions that they gave as to the competency of Mr. Wilson are based upon facts and circumstances entitled, in the judgment of this court,

to greater weight than the circumstances and facts detailed by the witnesses for the contestant, and without going into detail, the court is of the opinion that, from all the testimony in this case, the verdict of the jury is so clearly unsupported by the weight of the evidence as to indicate some misapprehension or mistake, or bias on the part of the jury, or of wilful disregard of the law as given by the court in its charge.

We think it comes within the rule that a reviewing court, where the verdict of a jury is manifestly against the weight of the evidence, that it is the duty of the court to set aside the verdict, and grant a new trial.

Upon the issue as to undue influence, we think that the weight of the testimony is against this proposition, and there is not that preponderance of evidence upon either issue that would warrant the jury in returning the verdict they did in this case. Therefore, for this reason, the judgment in this case will be reversed.

So far as the charge of the court is concerned, and its rulings upon the requests asked by the respective parties, we do not think there was any error committed. Some of the requests that were refused were abstract legal propositions, in the main correct, but there was no special reason why they should be given, because they had no application, especially to the facts and circumstances of this case; and, therefore, we think that where the court refused to give the special requests. there was no error committed.

In the general charge, the court covers substantially the whole of this case, and had the jury applied the facts to the law as given by the court, we think that there necessarily would have been a different verdict returned. It seems that the verdict is the result either of a misapprehension of the charge of the court as to the law, or bias and prejudice in favor of the contestant, and that they must have caught the spirit that was breathed forth in the testimony of several of the witnesses, and the reason they thought the old gentleman was not competent to make a will was, that he made a will different from what they would have made.

The verdict and judgment of the court rendered in this

Wilson v. Wilson.

case are reversed, with costs, set aside and held for naught, and the cause remanded to the common pleas court for further proceedings and trial according to law.

Exceptions are noted.

**Taggart** and **Donahue, JJ.,** concur.